UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SOVEREIGN O'DELL ,

    Plaintiff,

v.

KELLY SERVICES, INC.;
JOHN NICHOLSON;
TRACI HOPPER;
DAVID EAGER;
RICK PATTERSON;
POTTER, DEAGOSTINO, O'DEA &
PATTERSON;
FLINT TOWNSHIP POLICE
DEPARTMENT,
BERNADETTE KING;
GLOBAL SECURITY AND
INVESTIGATIONS; and
OFFICER FNU RYE;

    Defendants.

Case No. 15-cv-13511
Honorable Laurie J. Michelson
Magistrate Judge R. Steven Whalen

---

**OPINION AND ORDER GRANTING FLINT AND RYE'S MOTION FOR
JUDGMENT ON THE PLEADINGS [30] AND GRANTING IN PART THE KELLY
DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS [37]**

---

In 2012, Defendant Kelly Services, Inc., placed Plaintiff Sovereign O'Dell in a call-

center job. While on the job, O'Dell experienced symptoms from several medical conditions.

According to O'Dell, Defendants Bernadette King, John Nicholson, and Traci Hopper refused to

provide her with requested workplace accommodations. O'Dell further maintains that Nicholson

and Hopper wrongly terminated her employment with Kelly and that Nicholson filed a false

complaint about her with the police department of Defendant Flint Township. O'Dell also

believes that Defendant Rick Patterson, and his law firm, Defendant Potter, DeAgostino, O'Dea

& Patterson (the Potter Firm), wrongly challenged her claim for unemployment benefits. Based

on these and other alleged wrongs, O'Dell sued Kelly, King, Hopper, Nicholson, David Eager, Global Security and Investigations, Patterson, and the Potter Firm (the Kelly Defendants) and Flint Township and Officer Rye (the Flint Defendants).

Both the Kelly Defendants and the Flint Defendants have filed a motion for judgment on the pleadings. Having reviewed the parties' briefs, the Court does not believe oral argument would aid in resolving the two motions. *See* E.D. Mich. LR 7.1(f)(2). For the reasons that follow, the Court will grant the Flint Defendants' motion (R. 30) and grant in part the Kelly Defendants' motion (R. 37).

## I.

Because Defendants have moved for dismissal pursuant to Federal Rule of Civil Procedure 12(c), the Court presents as true the non-conclusory factual allegations of O'Dell's Second Amended Complaint (which the Court more simply refers to as the "complaint"). *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 898 (6th Cir. 2014). Because O'Dell's *pro se* complaint is insufficient to present a complete factual narrative, the Court has—quite limitedly—supplemented the complaint with facts consistent with the complaint and taken from public records (e.g., O'Dell's EEOC charge, a complaint and motion from state-court proceedings, a police report, and documents filed in an unemployment proceeding). *See Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008).

In 2012, Defendant Kelly Services, Inc. contacted O'Dell about a telephone-operator job at Diplomat Specialty Pharmacy. (R. 24, PID 153 ¶ 16.) The terms of the offer included permanent employment and medical insurance once O'Dell completed 500 hours at Diplomat. (*Id.*) When O'Dell expressed to Kelly that she was medically prohibited from working in a non-routine environment, Kelly assured O'Dell that the job only involved answering the phone and

2

transferring the call. (R. 24, PID 153 ¶¶ 18, 19.) O'Dell accepted the offer and began working at Diplomat's call center. (R. 24, PID 153 ¶¶ 20, 21.)

"From day 1," O'Dell was provided with "constantly changing directives." (R. 24, PID 153 ¶ 23.) O'Dell says that these frequent changes "triggered [her] impairments." (*Id.*) O'Dell apparently refers to her "PTSD, Adjustment Disorder with Anxiety and Depression, and Traumatic Brain Injury." (*See* R. 24, PID 161 ¶ 98.)

O'Dell thus approached Defendant Bernadette King, the site supervisor, about possibly needing an accommodation for her impairments. (R. 24, PID 153 ¶¶ 24, 25.) Because King was unsure whether Kelly was required to provide accommodations, King told O'Dell that she would contact her boss at Kelly. (*Id.* ¶ 26.) O'Dell ended up making a formal request for accommodations, but, in an email, King informed O'Dell that no accommodations would be provided. (*Id.* ¶ 27.)

In addition to her mental impairments, O'Dell also suffers from menometrorrhagia (excessive uterine bleeding), dysmenorrhea (menstrual cramps), and fibroid tumors (noncancerous growths of the uterus). (R. 24, PID 161 ¶¶ 97, 99–100.) During her employment, O'Dell experienced "multiple heavy menstrual cycles each month" and needed to "spend time in the restroom managing the persistent bleeding." (*Id.* ¶¶ 99–100.) At one point, an employee with supervisory authority followed O'Dell into the bathroom, entered the stall adjacent to one O'Dell was using, and then followed O'Dell out of the bathroom. (*Id.* ¶ 102.) This caused O'Dell "additional psychological stress." (*Id.* ¶ 103.)

At some point (the complaint does not provide dates for a number of significant events), O'Dell contacted Kelly's corporate headquarters. (R. 24, PID 154 ¶ 28.) Someone from Kelly's human-resources, calling on behalf of Defendant Tracy Hopper, told O'Dell that Kelly would not

2:15-cv-13511-LJM-RSW   Doc # 54   Filed 02/21/17   Pg 4 of 28   Pg ID 723

investigate her hostile work-environment claim based on the bathroom incident unless she could prove that she was in fact followed into the bathroom. (*Id.* ¶ 29.) The HR employee also told O'Dell that no work accommodations would be provided. (*Id.* ¶ 30.)

At some later point, O'Dell again contacted Kelly's corporate headquarters about an accommodation. (R. 24, PID 154 ¶ 31.) This time, Defendant John Nicholson, the district manager for Kelly's Flint, Michigan location, responded to O'Dell. (*Id.* ¶ 31.) Nicholson told O'Dell that he wanted to investigate the situation, would speak with King, and would then schedule a meeting to discuss the requested accommodations. (*Id.* ¶ 33.) Nicholson also told O'Dell that she had worked for over 500 hours but had not been made a permanent employee of Diplomat and that her job duties would be expanded to include prescription-refills. (*See* R. 24, PID 154 ¶ 34.) But O'Dell was medically prohibited from handling refills because "it involves cash, other payments, counting, and is not routine." (*Id.*)

On May 20, 2013,[1] O'Dell met with Nicholson and Hopper. At the meeting, O'Dell was told that no investigation had been completed, that Nicholson had not spoken to King, and that Nicholson and Hopper had decided that O'Dell "should not work at Diplomat even one more day." (R. 24, PID 154 ¶ 35.)

At the meeting, Nicholson also told O'Dell that they would find her employment within two weeks. (R. 24, PID 154 ¶ 36.) Between May 20 and August 28, 2013, Nicholson consistently told O'Dell that she was still a Kelly employee and that they were seeking work for her. (*Id.* ¶ 154.) But O'Dell was only given one interview. (*Id.* ¶ 37.) And that job had been filled before Kelly had allowed O'Dell to interview. (*Id.*)

---

[1] Although the complaint consistently uses 2012, other documents, including those drafted by O'Dell, reveal that the correct date is 2013.

Kelly discharged O'Dell on August 12, 2013. (R. 37, PID 358.) On or around this date, Hopper told O'Dell that she was prohibited from ever contacting any Kelly employee in the future. (R. 24, PID 163 ¶ 117.)

According to a police report attached to O'Dell's brief, on the day of O'Dell's termination, Defendant Thomas Rye, a Flint Township police officer, responded to a complaint made by Nicholson. (*See* R. 37, PID 566.) According to the complaint, Nicholson had accused O'Dell of "threaten[ing] him and [coming] on Kelly property to carry out the threats." (R. 24, PID 155 ¶ 43.) O'Dell says that the police complaint was false and an act of retaliation. At some point (again the complaint does not say when), Nicholson and Hopper had taken the position that when O'Dell "asked for accommodations, pursuant to Kelly policy, it is considered a voluntary quit." (*Id.* ¶ 40.) O'Dell responded by threatening to report this mischaracterization to the State of Michigan, which, says O'Dell, caused Nicholson to retaliate with the police complaint. (*Id.* ¶¶ 42–43.)

Soon after her termination (perhaps the next day), O'Dell received a letter from Defendant David Eager. (R. 24, PID 155 ¶ 45, PID 163 ¶ 117.) According to the complaint, Eager is an employee of Defendant Global Security and Investigation Services (Kelly disputes this). (*See id.* ¶ 46.) Eager noted that O'Dell had been warned not to contact Kelly employees in the future and "threatened unspecified harm to [O'Dell] if the command was not obeyed." (*Id.* ¶ 118.)

On August 16, 2013 (four days after her termination at Kelly), O'Dell sued Kelly and Diplomat Specialty Pharmacy in state court. (R. 37, PID 337–47.) The Potter Firm and, in particular, Defendant Rick Patterson, represented Kelly. On September 6, 2013, Kelly moved for summary disposition. (R. 37, PID 327.) Attached to that motion was a printout of one of

O'Dell's Facebook posts. (R. 37, PID 349.) The post discusses workplace violence. (*See id.*) O'Dell alleges that the post was private and that Kelly hacked her Facebook account to obtain it. (*See* R. 24, PID 155 ¶¶ 49–51.) On September 30, 2013, the state court granted Kelly summary disposition. Case Register of Actions, Michigan Circuit Court for Genesee County, Case No. 13-101033 *available at* http://www.co.genesee.mi.us/roaccsinq/default.aspx.

At some point, O'Dell applied for unemployment benefits. In October 2013, O'Dell was found not qualified, but in January 2014, an administrative law judge found that O'Dell was entitled to unemployment. (R. 48, PID 497, 500.) Kelly (via Patterson and the Potter Firm) unsuccessfully appealed this determination. (*See* R. 48, PID 508, 593–94.) It was during the course of these unemployment proceedings that O'Dell learned of the police complaint. (R. 24, PID 155 ¶ 44.)

O'Dell filed this lawsuit on October 7, 2015. Her *pro se* complaint sets forth 10 counts, many asserting several claims. (*See generally* R. 24.)

Both the Kelly Defendants and the Flint Defendants move for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). (R. 30, 37.)

## II.

A Rule 12(c) motion is governed by the legal standards that govern a Rule 12(b)(6) motion. *See Daily Servs., LLC v. Valentino*, 756 F.3d 893, 898 (6th Cir. 2014); *Marais v. Chase Home Fin. LLC*, 736 F.3d 711, 713 (6th Cir. 2013). This means that the plausibility standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), applies here. Under that standard, a court first culls legal conclusions from the complaint, leaving only factual allegations to be accepted as true. *Iqbal*, 556 U.S. at 679. The inquiry then becomes whether the remaining assertions of fact "allow[] the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Although this plausibility threshold is more than a "sheer possibility that a defendant . . . acted unlawfully," it is not a "'probability requirement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). Whether a plaintiff has presented enough factual matter to "'nudg[e]'" his claim "'across the line from conceivable to plausible'" is "a context-specific task" requiring this Court to "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679, 683 (quoting *Twombly*, 550 U.S. at 570).

## III.

### A.

Count IV asserts that Kelly (only) violated the Americans with Disabilities Act by failing to accommodate O'Dell's mental and physical disabilities. (R. 24, PID 162 ¶¶ 110–11.) She asserts that while at Diplomat, her mental impairments were triggered resulting in memory lapses, difficulty concentrating, and panic attacks. (R. 24, PID 162 ¶ 104.) O'Dell says that Kelly failed to provide the accommodations she sought, including being assigned to another company. (*See* R. 24, PID 162 ¶¶ 105–07.)

Kelly seeks to dismiss O'Dell's ADA claims on multiple grounds.

Kelly first argues that any claims based on events before May 25, 2013—including any failure to accommodate her disabilities at Diplomat—are untimely. (R. 37, PID 310–11.) In particular, Kelly argues that under 42 U.S.C. § 12117(a), any claims based on conduct more than 300 days before an EEOC charge is filed are untimely, O'Dell filed her EEOC charge on March 21, 2014, and that 300 days prior to March 21, 2014 is May 25, 2013. (R. 37, PID 310.)

Kelly claims that the date stamp on O'Dell's EEOC charge establishes a March 21, 2014 filing date. But O'Dell says she first sent her charge to the Michigan Department of Civil Rights

and requested that the charge be filed with the EEOC. (R. 47, PID 425; R. 37, PID 359.) And the MDCR is a Fair Employment Practices agency. *See* 29 CFR § 1601.80. These three facts matter because "[w]hen a charge is initially presented to a FEP agency and the charging party requests that the charge be presented to the Commission," the charge is deemed filed with the EEOC on the earliest of three dates, including the date that the FEP agency waives its "right to exclusively process the charge." *See* 29 C.F.R. § 1601.13(b)(1). Thus, the effective filing date may be several days before the date time stamped on the charge. And a few days is significant because O'Dell says she was removed from Diplomat on May 20, 2013, and, under Kelly's calculations (based on the time stamp), events before May 25, 2013 are untimely. While the MDCR's decision is likely a public record that the Court could have considered on a Rule 12(c) motion, neither party has provided it. Thus, given the five-day difference, the Court will not at this point dismiss as untimely O'Dell's ADA claims that she did not receive a reasonable accommodation while she was at Diplomat.[2]

Kelly next argues that O'Dell's ADA claims are subject to dismissal because she has not alleged facts showing that she has a "disability" within the meaning of the Act. (R. 37, PID 312.)

The Court disagrees. Under the ADA, "[t]he term 'disability' means . . . (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42

---

[2] Although neither party has addressed the issue, there is a circuit split on whether a plaintiff or defendant has the burden of establishing that a charge was timely filed. *Compare McIver v. Am. Eagle Airlines, Inc.*, 413 F. App'x 772, 777 (5th Cir. 2011); *Laouini v. CLM Freight Lines, Inc.*, 586 F.3d 473, 475 (7th Cir. 2009), *with Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1167 (10th Cir. 2007); *see also* Viviana Aldous, *Timed out of Title VII Claims: Which Party Should Bear the Burden of Showing Compliance with Title VII Timing Requirements?*, 2014 U. of Chi. Legal Forum 697 (2014). But even if the burden is O'Dell's, the Court would at most dismiss claims based on conduct prior to May 25, 2013 without prejudice, giving O'Dell the chance to show that the filing date was earlier than the date stamped on her EEOC charge.

U.S.C. § 12102(1). In her complaint, O'Dell has alleged that she suffers from "PTSD, Adjustment Disorder with Anxiety and Depression, and Traumatic Brain Injury" that causes her to experience "lapses of time and memory loss akin to Alzheimer's." (R. 24, PID 161, ¶ 98.) She also asserts that she has physical impairments of "menometrorrhagia, dysmenorrhea, fibroid tumors, and stress-induced stuttering" which causes multiple heavy menstrual cycles per month and pain. (R. 24, PID 161 ¶ 97.) Accepting these allegations as true, it is plausible that these medical conditions substantially limit a major life activity such as sleeping or concentrating. *See* 42 U.S.C. § 12102(2)(A).

Kelly next argues that O'Dell's failure-to-accommodate claims under the ADA are subject to dismissal because she has "not alleged facts to demonstrate that she was qualified to perform the essential job functions of working at [Diplomat] with or without an accommodation." (R. 37, PID 312–13.)

Insofar as the Diplomat job goes, the Court agrees with Kelly. O'Dell has "the burden of proposing an accommodation and proving that it is reasonable." *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010) (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1184 (6th Cir. 1996) *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012)). Yet O'Dell's complaint nowhere specifies the accommodations she requested so that she could continue to work at Diplomat.

Even so, the Court will not completely dismiss O'Dell's claim that Kelly deprived her of a reasonable accommodation while at Diplomat. In her response to the Kelly Defendants' motion, O'Dell says nothing about requesting accommodations for her physical impairments. But she does assert that she asked that her difficulties with the non-routine environment at Diplomat (i.e., her mental impairments) be accommodated "by simply providing a single set of

9

instructions or, alternatively a single supervisor per shift to answer to, rather than the upwards of 8 dissenting opinions on proper protocol." (R. 47, PID 436.) Without more information, the Court cannot say that an accommodation of a single set of instructions or a single supervisor is, as a general matter, unreasonable. *See Monette*, 90 F.3d at 1184 n.10 (providing that the employee's burden is only to show that the requested accommodation was reasonable in a general sense, after which, the employer would have the burden of showing that the accommodation was an undue hardship given the employer's particularized situation); *accord Walsh v. United Parcel Serv.*, 201 F.3d 718, 726 n.3 (6th Cir. 2000). As such, O'Dell will be given leave to amend her failure-to-accommodate claim to include the allegation that, while at Diplomat, she asked for a single set of instructions or a single supervisor per shift to accommodate her mental impairments.

Kelly's argument that O'Dell was medically prohibited from filling prescriptions does not require a different result. The complaint indicates that refills were not initially a requirement of the Diplomat job. (R. 24, PID 154 ¶ 34.) Thus, O'Dell's inability to fill prescriptions would at most warrant dismissal of her claim that she was not accommodated at Diplomat *after* that became a job requirement.

Finally, although Kelly focuses on the Diplomat job, O'Dell's failure-to-accommodate claim is broader. Indeed, one of the accommodations that O'Dell requested was for Kelly to place her somewhere other than Diplomat. (R. 24, PID 162 ¶¶ 105–06.) And "an employer has a duty under the ADA to consider transferring a disabled employee who can no longer perform [her] old job even with accommodation to a new position within the [c]ompany for which that employee is otherwise qualified." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th

10

Cir. 2007). As such, even if O'Dell could not perform the essential functions of the Diplomat job, that would not dispose of her claim that she was entitled to placement elsewhere.

In short, the Court will not dismiss O'Dell's failure-to-accommodate claims under the ADA insofar as they are based on her mental impairments.

In Count IV, O'Dell also brings a retaliation claim under the ADA. (R. 24, PID 162 ¶¶ 112–13.) O'Dell says that Kelly mischaracterized her requests for accommodations as a "voluntary quit," and when she threatened to report this mischaracterization to the State of Michigan, Kelly filed a police complaint. (*See* R. 24, PID 155 ¶¶ 40–43.) Apparently, O'Dell's threat is also the basis for her claim that Kelly retaliated against her by terminating her employment. (*See* R. 24, PID 162 ¶ 113.)

Kelly argues that O'Dell's retaliation claims must be dismissed because O'Dell has not adequately pled a causal connection between her conduct and the police complaint. (R. 37, PID 314–15.)

Even if the Court agreed with Kelly, it would again grant O'Dell leave to amend her ADA retaliation claim. In her state-court complaint, O'Dell more clearly set forth a causal chain. There, she asserted that it was during the unemployment proceedings that Kelly claimed that she had voluntarily quit. (R. 37, PID 343.) And that on August 9, 2013, she told Nicholson (via email) that if he did not revise the designation by August 15, 2013, she would "seek court intervention." (R. 37, PID 344.) "In response," the state-court complaint says, "[O'Dell] received a telephone call from Tracy Hopper and David Eager on August 12, 2013 in which Tracy [Hopper] argued with the plaintiff, told her the email was unprofessional, and stat[ed] that *based upon the email*, [O'Dell's] employment with Kelly Services is terminated." (R. 37, PID 344 (emphasis added).) Thus, based on the state-court complaint, it appears that O'Dell could make a

11

plausible claim that absent her threat to report the voluntary-quit designation, she would not have been terminated.

In sum, the Court will grant leave for O'Dell to replead her accommodation and retaliation claims under the ADA and will not dismiss those claims at this time.

**B.**

Although labeled as "Discrimination and Retaliation: 42 U.S.C. § 1983," the substance of Count II is that Kelly, Nicholson, King, and Hopper violated Title VII of the Civil Rights Act of 1964 in several ways. Title VII makes it unlawful to treat an employee differently "because of . . . sex," which includes treating an employee differently "on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. §§ 2000e–2(a), 2000e(k). O'Dell claims that during her employment at Diplomat, she was subjected to a hostile work environment, including being "followed to and observed" when she used the bathroom to care for her pregnancy-related medical conditions. (R. 24, PID 158 ¶ 71.) O'Dell also alleges that Kelly "classified" her based on her pregnancy-related disabilities, which deprived her of access to thousands of jobs in Kelly's network. (R. 24, PID 158 ¶ 72.) Unrelatedly, O'Dell, apparently referring to the police complaint, asserts that Nicholson and others "levied the accusation of being a violent employee" against her because her "birth father originated in the Caribbean" and her "birth mother has African American in the lineage." (R. 24, PID 158–59 ¶ 76.) O'Dell says that this amounted to race and national-origin discrimination in violation of Title VII. (*Id.*)

The Kelly Defendants assert that the Court does not have to reach the merits of these claims. (R. 37, PID 308.) They argue that O'Dell has filed only one charge with the EEOC and the charge does not allege different treatment on the basis of "national origin, race, and/or

pregnancy related (gender) discrimination." (*Id.*) In other words, the Kelly Defendants say O'Dell has not exhausted her claims based on those protected characteristics. (*Id.*)

"As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in [her] EEOC charge." *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010) (citing 42 U.S.C. § 2000e-5(f)(1); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974)). Also, "because aggrieved employees—and not attorneys—usually file charges with the EEOC, their *pro se* complaints are construed liberally, so that courts may also consider claims that are reasonably related to or grow out of the factual allegations in the EEOC charge." *Id.* Thus, "whe[n] facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim." *Id.* (internal quotation marks omitted); *see also Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004).

The assertions in O'Dell's EEOC charge would not have prompted the EEOC to investigate claims based on O'Dell's race or national origin: the charge is completely devoid of anything pertaining to race or national origin. (*See* R. 37, PID 358.)

O'Dell's claims of sex discrimination, based on the Kelly Defendants' treatment of her pregnancy-related medical conditions, are also not reasonably related to the allegations of the EEOC charge. The charge does state that it is based on "disability." (*Id.*) And O'Dell claimed that she was discharged and harassed "due to [her] disability and for filing an external complaint of discrimination." (R. 37, PID 358.) The charge also states, "On or around May 1, 2013, I informed management of my intent to file a complaint of discrimination due to the hostile work environment created by my supervisor." (*Id.*) When she wrote this statement, O'Dell may have been thinking of the bathroom incident.

13

But the charge does not give any indication of a disability related to pregnancy (or O'Dell's sex). The charge states that her disability limits work to "a non competitive, low stress work environment with routine job duties." This appears to be clearly related to her mental health issues, and a vast array of medical conditions could require those limitations. Either way, the Court is hard pressed to see how an EEOC investigator would reasonably infer a pregnancy-related medical condition. In other words, the charge broadly alleges wrongful treatment toward a person with a disability, but does not take the further step of suggesting that the disability is related to a person's sex. Indeed, the charge cites the Americans with Disabilities Act and the Michigan Persons with Disabilities Act, but not Title VII or Michigan's analog. (*See id.*) As such, the Court finds that the charge would not have prompted the EEOC to investigate disparate treatment or hostility "on the basis of pregnancy, childbirth, or related medical conditions," 42 U.S.C. § 2000e(k).

O'Dell resists this conclusion by arguing that in responding to her charge, Kelly recognized that some of her disabilities were related to pregnancy or childbirth. (R. 47, PID 425.) It is true that in responding to the EEOC, Kelly referenced the bathroom incident and "menometrorrhagia, dysmenorrhea, and fibroids." (R. 48, PID 575.) Even so, the Court is not persuaded that O'Dell has properly exhausted her Title VII sex-discrimination claims. Although there is support for considering Kelly's EEOC response in applying the scope-of-investigation test, *see Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d 367, 380 (6th Cir. 2002), a complete reading of the response (and O'Dell's reply to that response) reveals that the parties were focused on whether Kelly had complied with the Americans with Disabilities Act. There is no mention of sex discrimination. As such, the Court maintains that O'Dell's claims of sex discrimination were not exhausted by her EEOC charge.

14

Accordingly, O'Dell's claims under Title VII will be dismissed without prejudice.[3]

## C.

In Count III, O'Dell says that Defendants conspired to commit acts prohibited by 42 U.S.C. § 1985. That civil-rights statute prohibits conspiracies to deprive someone of equal protection of the laws. *See Webb v. United States*, 789 F.3d 647, 671–72 (6th Cir. 2015). O'Dell asserts that Defendants (initially just the Kelly Defendants) formed a conspiracy to retaliate against her for requesting an accommodation (R. 24, PID 159) and for informing them of her intent to report unemployment fraud. (R. 24, PID 160 ¶¶ 86, 87.) O'Dell also accuses the Kelly Defendants of hacking her Facebook account, filing a false police complaint, terminating her employment, and challenging her award of unemployment. (R. 24, PID 160 ¶ 88.) Finally, she says that all Defendants concealed the fact that a police complaint had been filed and that her Facebook account had been hacked, thereby violating subsections (2) and (3) of § 1985. (R. 24, PID 160 ¶¶ 89–90.)

Flint Township and Officer Rye argue that O'Dell has not alleged that they were co-conspirators. (R. 30, PID 256 n.2.) The Court agrees that O'Dell did not adequately allege that Flint and Rye were part of any conspiracy—a necessary element of a § 1985 claim, *Webb*, 789 F.3d at 671–72. O'Dell's complaint states that Flint and Rye did not permit her to respond to Nicholson's complaint and failed to adequately investigate that complaint. It also asserts that Flint and Rye concealed both the complaint and that her Facebook account had been hacked. Accepting these allegations as true, what is missing are allegations that make it plausible to infer that Flint and Rye had an *agreement* with any other defendant to engage in this conduct. As such,

---

[3] To the extent that Count II asserts claims pursuant to 42 U.S.C. § 1983, those claims are dismissed with prejudice: none of Kelly's, Nicholson's, King's or Hopper's conduct as alleged in Count II is attributable to the state. *See Marie v. Am. Red Cross*, 771 F.3d 344, 362 (6th Cir. 2014).

O'Dell's § 1985 against claims against Flint and Rye fail. *See Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 367–68 (6th Cir. 2012) ("[C]onspiracy claims must be pled with some degree of specificity.").

This leaves the Kelly Defendants (Kelly, Nicholson, Hopper, King, Global Security, Eager, the Potter Firm, and Patterson). They assert that O'Dell's § 1985 claims fail because they are one entity and a single entity cannot conspire with itself. (R. 37, PID 309.)

The Court agrees. The intra-corporate (or intra-entity) conspiracy doctrine provides that "where all of the defendants are members of the same collective entity, there are not two separate 'people' to form a conspiracy." *Amadasu v. The Christ Hosp.*, 514 F.3d 504, 507 (6th Cir. 2008) (internal quotation marks omitted); *see also Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008).

Here, O'Dell asserts that Nicholson, King, Hopper, Eager, and Patterson are "officers, agents, servants, representatives, or employees" of Kelly. (R. 24, PID 153 ¶ 15.) As such, they are all members of the same collective entity. Moreover, it appears that in denying O'Dell an accommodation, terminating her employment, contacting the police about a workplace threat, and challenging unemployment benefits, the Kelly Defendants acted within the scope of their employment. *See Amadasu*, 514 F.3d at 507 (indicating that intra-corporate conspiracy doctrine would not apply if defendants were acting outside the scope of their employment). As for the alleged Facebook hack, nothing indicates that the defendant who did this was acting for personal reasons instead of for reasons related to their job with Kelly. Indeed, O'Dell alleges in her complaint that Kelly would at some point claim it terminated her based on the Facebook post. (R. 24, PID 163 ¶ 120.) As such, the intra-corporate conspiracy doctrine bars O'Dell's § 1985 claims.

16

O'Dell, citing *Dunlop v. City of N.Y.* No. 06 CIV. 0433 (RJS), 2008 WL 1970002, at *10 (S.D.N.Y. May 6, 2008), asserts that the "personal interest" or "personal stake" exception to the intra-corporate conspiracy doctrine applies. True, the *Dunlop* court explained that a § 1985 claim may proceed if the alleged intra-corporate conspirators were "motivated by an independent personal stake in achieving the corporation's objective." *Id.* O'Dell's theory is that Nicholson, Hopper, and King were independently motivated to conspire against her because she had threatened to take "legal action" against them. (R. 47, PID 432.) The Court does not find this theory to be plausible given that Nicholson, Hopper, and King's alleged conspiracy involves conduct related to their job duties—their actions do not reflect that they were personally motivated by O'Dell's threat of suit. *See Bhatia v. Yale University*, No. 06 Civ. 1769(SRU), 2007 WL 2904205, at *2 (D. Conn. Sept. 30, 2007) (providing that the personal-stake exception applies where employees act in their personal interests "wholly and separately from the corporation").

O'Dell also points out that the intra-corporate conspiracy doctrine does not apply when the conspiracy is one under 18 U.S.C. § 371. (R. 47, PID 432.) But this is a criminal statute that involves conspiracies to commit offenses against the United States or its agencies. None of the wrongs alleged in O'Dell's complaint are wrongs to the United States and she has no ability to bring such a claim.

In short, the Court finds that O'Dell has failed to state a claim for relief under § 1985 and this claim will be dismissed with prejudice.

## D.

In Count I of her complaint, O'Dell alleges that Kelly, Nicholson, King, and Hopper violated her right to "make and enforce contracts" under 42 U.S.C. § 1981 by failing to comply

17

with various provisions of the employee handbook and by challenging her claim for unemployment. (R. 24, PID 156 ¶¶ 54–59.) She also complains that those defendants, along with Flint Township and Officer Rye, subjected her to dissimilar punishment as prohibited by § 1981 when they terminated her employment and filed a false police complaint. (R. 24, PID 157 ¶ 60.) Finally, O'Dell says that Flint and Rye violated § 1981 by preventing her from submitting evidence in response to Nicholson's police complaint. (R. 24, PID 157.)

Defendants assert that O'Dell's § 1981 claim fails because her complaint does not make it plausible that their allegedly wrongful actions were racially motivated.

The Court agrees. Section 1981 "relates solely to discrimination based on race and color." *Salem v. City of Pontiac Sch. Dist.*, 755 F.2d 933 (table), 1985 WL 12820, at *1 (6th Cir. 1985); *see also Williams v. Richland Cty. Children Servs.*, 489 F. App'x 848, 851 (6th Cir. 2012); *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 892 (7th Cir. 2016); *but see Anderson v. Conboy*, 156 F.3d 167, 169 (2d Cir. 1998) (providing that § 1981 also extends to alienage discrimination). A careful review of O'Dell's complaint reveals that it is entirely devoid of facts permitting a reasonable inference that Defendants engaged in the above conduct because of O'Dell's race (or national origin). Regarding the police report, all O'Dell says is that Nicholson is a "white citizen." (R. 24, PID 157.) But the mere fact that O'Dell and Nicholson are of different races does not show that Flint Township or Rye did not allow O'Dell to file a response *because of* their races. O'Dell also states, albeit not in her complaint, that Kelly wanted to cast her as "the angry brown girl who got violent at work." (R. 47, PID 423.) This is wholly conclusory; even if Kelly made a false complaint about workplace violence, O'Dell provides nothing to indicate that Kelly did so *because of* her race or national origin. The only other support O'Dell provides for racial (or national origin) discrimination is that there were job

18

openings in cities where the population is primarily white, and Kelly failed to place her in those jobs. (R. 47, PID 424.) Even assuming O'Dell is correct about the cities' demographics and that there were openings, she fails to state anything indicating that Kelly did not place her in the openings *because of* the cities' demographics.

In short, O'Dell has not pled facts permitting the reasonable inference that Defendants discriminated against her on account of her race or national origin. As such her § 1981 will be dismissed with prejudice.

### E.

In Count V, O'Dell asserts that Kelly, Nicholson, Hopper, and Eager violated her First Amendment rights in several ways. (*See* R. 24, PID 162–63.)

This claim will be dismissed. As suggested by the Kelly Defendants (although they rely on § 1983 case law), Kelly, Nicholson, Hopper, and Eager are not government actors. *See Hudgens v. N. L. R. B.*, 424 U.S. 507, 513 (1976) ("[T]he constitutional guarantee of free speech is a guarantee only against abridgment by government, federal or state."); *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 709 (7th Cir. 2010) ("The First Amendment only protects a person from the government, or a particular state actor, not from private citizens."); *Wilcher v. City of Akron*, 498 F.3d 516, 519 (6th Cir. 2007) (similar). And, for reasons similar to those provided in addressing O'Dell's § 1985 claim, the Court does not believe that O'Dell has adequately pled that Flint Township or Officer Rye conspired with these defendants.

Accordingly, Count V will be dismissed with prejudice.

### F.

In Count VI, O'Dell asserts that Kelly, Nicholson, King, Hopper, Eager, and Patterson violated her rights under the Fourth Amendment by hacking into her private Facebook page. (*See*

19

R. 24, PID 164 ¶¶ 127–31.) O'Dell also asserts that, in accepting a copy of the Facebook page, Flint Township and Officer Rye "accept[ed] the fruit of the poisonous tree" and thus, violated the Fourth Amendment. (R. 24, PID 164 ¶ 134.)

Count VI fails to state a claim upon which relief may be granted. Although the Kelly Defendants focus on the "under color of state law" requirement of a 42 U.S.C. § 1983 claim (*see* R. 37, PID 315), it suffices to say that the Fourth Amendment simply does not prohibit searches and seizures by non-government actors, *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). And, as discussed, O'Dell has not shown that Flint or Rye conspired with the Kelly Defendants. Further, O'Dell has identified no role for the fruit-of-the-poisonous tree doctrine in the context of this civil action. *See United States v. Williams*, 615 F.3d 657, 668 (6th Cir. 2010) (explaining the role of the fruit-of-the-poisonous-tree doctrine in criminal proceedings); *Townes v. City of N.Y.*, 176 F.3d 138, 145 (2d Cir. 1999) ("We find no case in which the [fruit-of-the-poisonous-tree] doctrine has been successfully invoked to support a § 1983 claim, and we see no reason why it could be.").

Count VI will be dismissed with prejudice.

## G.

In Count VII, O'Dell asserts that Kelly, Nicholson, King, Hopper, Eager, and Patterson violated the Stored Communications Act by "hacking into Facebook's servers." (R. 24, PID 165 ¶ 140.)

The Court agrees with the Kelly Defendants' that this claim is time barred. (*See* R. 37, PID 315–16.) The SCA provides, "[a] civil action under this section may not be commenced later than two years after the date upon which the claimant first discovered or had a reasonable opportunity to discover the violation." 18 U.S.C. § 2707(f). In her response to the Kelly

20

Defendants' motion, O'Dell suggests that she did not learn of the Facebook hack until January 14, 2014, making her SCA claim, filed on October 7, 2015, timely. (*See* R. 47, PID 446.) But the Kelly Defendants point out that their state-court motion for summary disposition, filed on September 6, 2013, attached the Facebook page in question. (*See* R. 37, PID 334, 349.) O'Dell does not address this point. And absent anything from O'Dell, the Court finds that the state-court motion, with the Facebook page attached, would have given her "a reasonable opportunity to discover the violation." As that motion was filed more than two years before this suit, O'Dell's SCA claim is untimely.

O'Dell's Stored Communication Act claim will be dismissed with prejudice.

## H.

Remaining are O'Dell's state-law claims. She invokes several legal theories and asserts even more claims based on those theories. In Count VIII, O'Dell asserts that Kelly breached the parties' employment contract in four ways. (R. 24, PID 165–66.) In Count IX, O'Dell asserts that Kelly, Nicholson, the Potter firm, and Patterson committed torts of abuse of process and malicious prosecution by making a false police complaint and by contesting her unemployment award. (*See* R. 24, PID 166–67.) In Count X, O'Dell alleges that Kelly, Nicholson, King and Hopper committed fraud by making false statements about the "quality and character of the job which was being offered to [her] as being fit for [her] disabilities." (R. 24, PID 167–68.) Also in Count X, O'Dell brings slander and libel claims based on allegedly false statements made by Kelly about "the safety of plaintiff to a work environment." (*See* R. 24, PID 167–68.)

Some of these claims are both legally and factually afield of the sole federal claim remaining in this case: O'Dell's claims under the ADA. O'Dell's ADA claims are based primarily (if not exclusively) on conduct that occurred after she started at Diplomat and on or

21

before her August 12, 2013 termination from Kelly. Yet O'Dell's fraud claim is based on statements made before she accepted employment at Diplomat. And the unemployment proceedings took place after O'Dell's termination from Kelly. As for the law, O'Dell's federal claims center of the following issues: whether she suffered from a "disability" within the meaning of the ADA; whether there were jobs that O'Dell could perform (perhaps with accommodation); and whether she was terminated and a police complaint was filed in retaliation for threatening to report Kelly's mischaracterization of her accommodation requests. Yet the elements of fraud, malicious-prosecution, and abuse-of-process have little if anything to do with these legal issues.

When, as here, subject-matter jurisdiction is based on the existence of a federal question, the Court may, in its discretion, decline supplemental jurisdiction over state-law claims. *Burkhead & Scott, Inc. v. City of Hopkinsville*, — F. App'x —, No. 16-5785, 2016 WL 6818857, at *2 (6th Cir. Nov. 18, 2016). In this case, the Court believes that it would be efficient to adjudicate as part of this case O'Dell's breach-of-contract claims because those claims are primarily based on conduct that occurred during the same time period as the conduct giving rise to her ADA claim and because the breach claims are partly based on Kelly's alleged failure to accommodate. Further, insofar as O'Dell's abuse-of-process and malicious-prosecution claims are based on the police complaint, the Court will also address those claims. This is because part of O'Dell's ADA claim is that Nicholson made the allegedly false police complaint to retaliate for conduct protected under the ADA. For a similar reason, the Court will also exercise supplemental jurisdiction over O'Dell's defamation claims. The Court will decline supplemental jurisdiction over (1) O'Dell's abuse-of-process and malicious-prosecution claims based on the

unemployment proceedings and (2) O'Dell's fraud claim based on Kelly's description of the Diplomat job.

## I.

In Count VIII, O'Dell asserts that Kelly breached the parties' employment contract in four ways. O'Dell says that she worked over 500 hours at Diplomat, but was never given increased pay or medical insurance as Kelly had promised. (R. 24, PID 165 ¶¶ 143–46.) O'Dell also says Kelly breached the employment contract by failing to provide an accommodation for her disabilities. (R. 24, PID 166 ¶¶ 151–53.) Third, O'Dell claims that between May 20 and August 28, 2012, Nicholson promised that other employment was being sought for her but that she was never offered any position (even though there were over 20 positions for which she was qualified). (R. 24, PID 166 ¶¶ 154–56.) Finally, O'Dell asserts that the employee handbook instructed her to apply for unemployment between jobs, but Kelly "challenged the award" of unemployment benefits. (R. 24, PID 165 ¶¶ 147–50.)

In view of O'Dell's prior state-court lawsuit, all but the last of these claims are barred by Defendants' affirmative defense of claim preclusion.[4]

"The preclusive effect of a state court judgment is determined by that state's law." *Exec. Arts Studio, Inc. v. City of Grand Rapids*, 391 F.3d 783, 795 (6th Cir. 2004) (internal quotation marks omitted). In Michigan, "the doctrine of res judicata [i.e., claim preclusion] applies where: (1) there has been a prior decision on the merits, (2) the issue was either actually resolved in the first case or could have been resolved in the first case if the parties, exercising reasonable

---

[4] Claim preclusion likely applies to some of the claims analyzed above, but it does not appear to be a complete bar to at least some of those claims. Further, some of the previously-addressed claims (e.g., O'Dell's First and Fourth Amendment claims) were more easily resolved on other grounds. For that reason, the Court has not addressed the Kelly Defendants' assertion of claim preclusion until this point.

diligence, had brought it forward, and (3) both actions were between the same parties or their privies." *Paige v. City of Sterling Heights*, 720 N.W.2d 219, 234 n.46 (Mich. 2006) (brackets added); *see also Washington v. Sinai Hosp. of Greater Detroit*, 733 N.W.2d 755, 759 (Mich. 2007).

The first and third requirements are readily satisfied here: judgment in favor of Kelly (and Diplomat) was entered in the state-court action.

Regarding the second element, the Kelly Defendants paint with too broad a brush. They assert that—with exception for her ADA claims—O'Dell's complaint is barred by claim preclusion. (*See* R. 37, PID 322.) But it appears that conduct giving rise to some of O'Dell's claims had either not yet occurred when she filed her state-court lawsuit or there was no reasonable way for her to have learned of the conduct before filing that action. As examples, it appears that O'Dell had no reasonable means of learning about the police complaint or that the Kelly Defendants had accessed her Facebook account before she filed her state-court suit. As such, the Court finds that to the extent that O'Dell's claims are either based on conduct that occurred after the initiation of the state-court action or based on facts that could not have been uncovered through reasonable diligence prior to suit, those claims are not precluded.

This means that three of O'Dell's breach-of-contract claims are precluded: her claim that Kelly failed to make her a permanent employee after 500 hours, her claim that Kelly failed to accommodate her disabilities, and her claim that Kelly failed to find her other work. Everything suggests that, through reasonable diligence, O'Dell could have discovered the facts giving rise to these alleged contract violations before filing her state-court action. As such, these three claims are barred by the doctrine of claim preclusion and will be dismissed with prejudice.

24

As for O'Dell's fourth breach of contract claim, that Kelly breached the employment agreement by contesting her unemployment award, the Court will dismiss that claim without prejudice. As the Kelly Defendants point out, O'Dell cites no contract provision prohibiting Kelly from challenging her award.

## J.

In Count IX, O'Dell asserts that Kelly, Nicholson, the Potter firm, and Patterson committed torts of abuse of process and malicious prosecution by making a false police complaint. (*See* R. 24, PID 166–67 ¶¶ 159–66.)

Making a complaint to the police is not an abuse of process because the initiation of process does not give rise to that tort. *Friedman v. Dozorc*, 312 N.W.2d 585, 595 (Mich. 1981) ("[An] action for abuse of process lies for the improper use of process after it has been issued, not for maliciously causing it to issue." (internal quotation marks omitted)).

O'Dell's malicious prosecution claim based on the police complaint also fails as a matter of law. In particular, "a plaintiff cannot support his malicious prosecution action by showing he was merely arrested, that a warrant was issued for his arrest or that he was investigated by law enforcement authorities." *Bloch v. Bloch*, No. 307640, 2013 WL 951076, at *3 (Mich. Ct. App. Mar. 7, 2013). Instead, "the plaintiff must show that he was formally charged with a crime by the prosecutor and a prosecution was initiated." *Id.* O'Dell has not alleged that she has been charged with anything based on Nicholson's complaint.

Accordingly, O'Dell's abuse-of-process and malicious-prosecution claims—insofar as they are based on the fact that Nicholson made a police complaint—will be dismissed with prejudice.

**K.**

In Count X, O'Dell asserts that Kelly, Nicholson, King, Hopper, Eager, and Patterson "misrepresented material facts regarding the quality and character of plaintiff." (R. 24, PID 167.) In particular, O'Dell asserts that those defendants misrepresented her as posing a safety concern in the workplace. (R. 24, PID 168.)

Because O'Dell's slander and libel claims are vague, the Kelly Defendants reasonably construed the claim as limited to statements made or published during the state-court lawsuit and the unemployment proceedings (but they do not assert a statute of limitations argument). (R. 37, PID 320.) But in her response to the Kelly Defendants' motion, O'Dell clarifies that she is not only claiming that Kelly made misrepresentations during those proceedings, but also in the course of the EEOC proceedings and to the Flint Police Department. (R. 47, PID 451.)

Because it is not apparent that Kelly's assertion of absolute privilege extends to all of these claims, and because this case will proceed at least on O'Dell's ADA claim, the Court will grant O'Dell leave to replead her slander and libel claims. At which point, the Kelly Defendants may evaluate whether another motion for dismissal is warranted.

**IV.**

For the foregoing reasons the Court orders as follows:

- Count I (based on 42 U.S.C. § 1981) is DISMISSED WITH PREJUDICE;

- Count II is DISMISSED WITHOUT PREJUDICE insofar as it asserts violations of Title VII and is DISMISSED WITH PREJUDICE insofar as it asserts claims brought under 42 U.S.C. § 1983;

- Count III (based on 42 U.S.C. § 1985) is DISMISSED WITH PREJUDICE;

- Count V (based on the First Amendment) is DISMISSED WITH PREJUDICE;

- Count VI (based on the Fourth Amendment) is DISMISSED WITH PREJUDICE;

- Count VII (based on the Stored Communications Act) is DISMISSED WITH PREJUDICE;

- Count VIII is DISMISSED WITHOUT PREJUDICE insofar as it asserts a breach of contract claim based on Kelly's challenge to the award of unemployment benefits and is otherwise DISMISSED WITH PREJUDICE;

- Count IX is DISMISSED WITH PREJUDICE insofar as it asserts abuse-of-process and malicious-prosecution claims based on the police complaint and is DISMISSED WITHOUT PREJUDICE to refiling in state court insofar as it asserts abuse-of-process and malicious-prosecution claims based on the unemployment proceedings;

- Count X is DISMISSED WITHOUT PREJUDICE to refiling in state court insofar as it asserts fraud.

Remaining in this suit is Count IV, O'Dell's Americans with Disabilities Act claim against Kelly (only), and Count X insofar as it asserts defamation against Kelly, Nicholson, King, Hopper, Eager, and Patterson. Accordingly, Global Security and Investigations, the Potter Firm, Flint Township, and Thomas Rye are DISMISSED. Consistent with this opinion, O'Dell must re-plead her claims that Kelly retaliated against her in violation of the ADA when it filed a police complaint and that Kelly failed to provide reasonable accommodations. O'Dell must also re-plead her claim that Kelly, Nicholson, King, Hopper, Eager, and Patterson defamed her by making false statements about her character. Absent a motion and an order granting that motion, O'Dell is not otherwise permitted to amend her complaint. O'Dell shall file her amended complaint, which should include only these two counts and the relevant factual matter, on or before March 6, 2017. Absent leave of Court, O'Dell's amended complaint is not to exceed 10 double-spaced pages in 12-point font.

In prior orders, the Court stayed discovery and motion practice in this case. (R. 35, 51.) In the order staying discovery, the Court stated, "Following resolution of both Rule 12(c) motions, should the case survive, the Court will hold another telephone status conference to set a new schedule for the case." (R. 35, PID 284.) Accordingly, the Court orders the parties to appear via telephone on April 25, 2017 at 3:00 p.m.

SO ORDERED.


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 21, 2017.


Julie Owens acting on behalf of Keisha Jackson
Case Manager