UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SOVEREIGN O'DELL ,

      Plaintiff,

v.

KELLY SERVICES, INC.,
JOHN NICHOLSON,
TRACI HOPPER,
DAVID EAGER,
RICK PATTERSON, and
BERNADETTE KING,

      Defendants.

Case No. 15-cv-13511
Honorable Laurie J. Michelson
Magistrate Judge R. Steven Whalen

---

**OPINION AND ORDER
GRANTING IN PART DEFENDANTS' MOTION FOR PARTIAL DISMISSAL [63]**

---

This is Round 2 of Defendants' efforts to preclude portions of Plaintiff's lawsuit. This time, Defendant Kelly Services, Inc. has moved to dismiss part of Plaintiff Sovereign O'Dell's complaint primarily on the basis that O'Dell did not file for relief in time. But the argument is more involved than Kelly appreciated given that the complaint raises many claims and is vague about when certain events took place. In the end, the Court finds that Kelly's timeliness arguments have a limited effect on O'Dell's claims under the Americans with Disabilities Act. And they only warrant partial dismissal of O'Dell's defamation claims. The Court will, however, dismiss the remainder of O'Dell's defamation claims on the grounds of privilege.

**I.**

**A.**

The Court presents the non-conclusory allegations of O'Dell's third-amended complaint as fact. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

O'Dell possesses certain work skills but also suffers from impairments that limit her ability to complete certain tasks. In addition to two associate's degrees, O'Dell holds a bachelor's degree in "Organizational Leadership and Communication." (R. 60, PID 776.) When she tested for employment at Kelly Services, she tested at the "Expert" level. (R. 60, PID 776.) But O'Dell's physical impairments of menometrorrhagia (excessive uterine bleeding), dysmenorrhea (menstrual cramps), and fibroid tumors (noncancerous growths of the uterus) "substantial[ly]" limit her ability to sit, stand, walk, and concentrate (among other things). (R. 60, PID 778.) O'Dell's Post-Traumatic Stress Disorder and Adjustment Disorder with Anxiety and Depression "substantially" limit her ability to sleep, think, concentrate, and communicate (among other things). (R. 60, PID 778.)

In December 2012, Kelly Services placed O'Dell as an operator in a call center. (R. 60, PID 775.) (Although her third-amended complaint does not say so, earlier versions provide that the call center was for a pharmacy. (R. 24, PID 153.))

After O'Dell began working at the call center, the "[e]ssential functions" of her job changed. (*See* R. 60, PID 775.) She began having to handle insurance and money. (*Id.*) This was stressful for O'Dell and thus, was "medically prohibited" by her impairments. (*Id.*) Further, the "metrics and procedures" of the job were changed multiple times each day. (*Id.*) This too was not compatible with O'Dell's impairments. (*See id.*)

As such, O'Dell requested job accommodations. "Between January 2013 and May 2013" (the third-amended complaint does not specify further), O'Dell asked to report to one supervisor each shift (instead of six or eight) or, alternatively, to have a single set of directives; to not handle cash or process payments; to be reassigned to a "routine" position; and for "non-limited, non-monitored use of restroom facilities" to manage her "excessive menses bleeding." (R. 60,

PID 776.) And between "February and May 20, 2013" (the complaint is also not more specific), three Kelly "agents"—Bernadette King, John Nicholson, and Traci Hopper—told O'Dell that "no accommodations would be provided to allow her to continue working as a Call Center Operator." (R. 60, PID 776.)

But on May 20, 2013, Nicholson and Hopper (on behalf of Kelly) told O'Dell "that the accommodation [that] would be provided [would be a] reassignment to a vacant position at a different worksite, with a start-date [in] two-weeks," i.e., June 3, 2013. (R. 60, PID 776.) This did not come to fruition. And while O'Dell continued to stay in contact with Kelly about reassignments through August 20, 2013, she was never reassigned. (R. 60, PID 776–77.) This despite the fact that her education and skill level qualified her for multiple positions that Kelly was "activity seeking to fill." (R. 60, PID 776–77.)

Meanwhile, O'Dell applied for unemployment benefits. This was consistent with Kelly's employee handbook: it directs employees to file for unemployment between jobs and says that Kelly will not oppose such applications. (*See* R. 60, PID 780.) But Kelly, through Nicholson, Hopper, and King, did oppose O'Dell's award of unemployment benefits. (R. 60, PID 777.) They did this by classifying O'Dell's request for accommodations as "voluntar[ily] quitting" her position. (R. 34, PID 777.)

On August 9, 2013, O'Dell advised Nicholson and Hopper (and thus Kelly) that by classifying her requests for accommodations as quitting they were committing fraud. (R. 34, PID 777.) She further told Nicholson and Hopper that she planned to report the fraud to the State of Michigan. (R. 34, PID 777.)

Three days later, on August 12, Nicholson made a complaint to the Flint Township Police Department. (*See* R. 34, PID 777.) In particular, Nicholson told police that O'Dell had threatened

him via phone, email, and Facebook, had shown up at Kelly offices to harm him, and had "peeled out" in her car when he came out of the back office. (R. 60, PID 779.) That same day, Hopper and David Eager called O'Dell and terminated her employment. (*Id.*)

At some point, one or more of Nicholson, Hopper, Eager, King, or Patterson accessed O'Dell's "private, password-protected Facebook post." (R. 60, PID 782.) In the post, O'Dell discusses workplace violence. (*See* R. 37, PID 349.) This post was provided to the Flint Township Police Department, the unemployment agency, and to the Equal Employment Opportunity Commission. (R. 60, PID 782.)

In March 2014, O'Dell filed a charge against Kelly with the Michigan Department of Civil Rights and indicated that she also wanted the charge filed with the EEOC. (R. 37, PID 359.) The MDCR found that the charge was filed too late with its office and would be forwarded to the EEOC to process. (R. 63, PID 815.) In July 2015, the EEOC issued O'Dell a right-to-sue letter. (R. 48, PID 592.)

In October 2015, O'Dell filed this lawsuit. (R. 1.)

**B.**

Kelly Services, Nicholson, Hopper, King, Eager, and Patterson, to which the Court will simply call "Kelly," ask the Court to dismiss part of O'Dell's third-amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (R. 63.) In the main, Kelly argues that O'Dell was too late in filing some of her claims with the EEOC or this Court. (*See id.*)

**II.**

**A.**

Before examining whether O'Dell's claims are timely, there is a threshold matter to resolve. Kelly previously moved to dismiss, and this Court dismissed a host of O'Dell's claims.

*See O'Dell v. Kelly Servs., Inc.*, No. 15-CV-13511, 2017 WL 676945, at *14 (E.D. Mich. Feb. 21, 2017). In so doing, the Court said O'Dell could re-plead her defamation claim and "her claims that Kelly retaliated against her in violation of the ADA when it filed a police complaint and that Kelly failed to provide reasonable accommodations." *Id.* But, this Court cautioned, "[a]bsent a motion and an order granting that motion, O'Dell is not otherwise permitted to amend her complaint." *Id.* O'Dell has not sought leave (and has said that her third-amended complaint is her last (*see* R. 64)), so the claims of her third-amended complaint should be limited to claims of defamation, retaliation under the ADA, and failure-to-accommodate under the ADA. Thus, Kelly asks this Court to strike certain allegations of the third-amended complaint on the grounds that they are beyond the amendments this Court permitted. (R. 63, PID 805.)

So before turning to issues of timeliness, the Court will identify the legal claims asserted (a task Kelly has not undertaken) and then decide which are within the scope of this Court's leave to amend.

## 1.

Because the third-amended complaint was not drafted by an attorney, the Court has read it liberally. *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011). Having done so, it appears to set forth claims of discrimination, retaliation, and failure-to-accommodate under the ADA. It also claims defamation.

Although pled under the heading "retaliation," it appears that O'Dell has two claims of disability discrimination under the ADA. She asserts that her "emotional impairments significantly impair her ability to communicate clearly," yet Kelly fired her for an "unprofessional communication" with Nicholson. (*See* R. 60, PID 780.) It also appears that

O'Dell believes Kelly discriminated by using the fact that she "self-identified as impaired" as grounds for not reassigning her to available positions. (*See* R. 60, PID 781.)

O'Dell apparently has five retaliation claims under the ADA: (1) Kelly did not reassign O'Dell to available positions in retaliation for "request[ing] accommodations" (*see* R. 60, PID 781); (2) Nicholson made a report to the police in retaliation for O'Dell's request for accommodations (*see* R. 60, PID 779); (3) Nicholson made the report in retaliation for O'Dell's threat to report Kelly's mischaracterization of her accommodation requests as quitting (*see id.*); (4) Kelly terminated O'Dell's employment in retaliation for O'Dell's threat to report Kelly's mischaracterization (*see* R. 60, PID 780); and (5) Kelly opposed her application for unemployment benefits in retaliation for requesting accommodations (*see* R. 60, PID 780).

O'Dell pleads two failure-to-accommodate claims: (1) Kelly denied reasonable accommodations that would have allowed her to continue as a call-center operator; (2) Kelly denied the reasonable accommodation of reassigning her from the call-center operator position to another position. (*See* R. 60, PID 779.)

In addition to ADA claims, O'Dell's third-amended complaint asserts that Kelly made defamatory statements to the Flint Township Police Department and during EEOC and unemployment proceedings. (R. 60, PID 782.) The alleged defamation includes publicizing O'Dell's private Facebook post where she discussed workplace violence. (*See* R. 60, PID 781–82.)

## 2.

Having identified the claims, the task is now to decide which are within the scope of this Court's leave to amend.

All of O'Dell's failure-to-accommodate claims are. Kelly points out that this Court only permitted O'Dell to re-plead her claim that Kelly failed to accommodate O'Dell's mental impairments—not her physical. (R. 63, PID 805–06.) True, the prior opinion did indicate that. *O'Dell*, 2017 WL 676945, at *5. But while O'Dell may be required to plead that she requested reasonable accommodations, it is not clear that she also had the burden to plead the specific accommodations she requested (e.g., one supervisor per shift), *cf. Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002) ("[t]he prima facie case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement"), or facts showing that the requested accommodations were reasonable, *see McBride v. City of Detroit*, No. 07-12794, 2007 WL 4201134, at *4 (E.D. Mich. Nov. 28, 2007); *Niece v. Fitzner*, 922 F. Supp. 1208, 1218 (E.D. Mich. 1996). Moreover, the Court permitted O'Dell to re-plead her claim that Kelly failed to accommodate when it failed to reassign her. *O'Dell*, 2017 WL 676945, at *5. And the reassignment requests may have been to accommodate both mental and physical impairments. The Court thus finds that all of O'Dell's failure-to-accommodate claims, whether based on mental or physical impairments, are within the scope of permitted amendment.

As for O'Dell's two discrimination claims, the Court's prior opinion did not mention a discrimination claim (apart from a failure-to-accommodate). But it does appear that O'Dell asserted in paragraph 109 (of 176) of her second-amended complaint that she was fired "based on communication" and that her ability to communicate was limited by her disabilities. (R. 24, PID 162.) So that claim is not new and within the scope of permitted amendment. O'Dell's claim that Kelly used O'Dell's "self-identif[ication] as impaired" as a basis for not reassigning her presents a closer call. In her second-amended complaint, O'Dell pled that Kelly used her "pregnancy-related disabilities" as a basis for not reassigning her. (*See* R. 24, PID 158.)

Although this allegation was under the umbrella of Title VII and not the ADA, it presented the theory that O'Dell was not reassigned on account of being disabled. So this ADA discrimination claim is also within the scope of permitted amendment.

The Court gave O'Dell leave to re-plead her ADA retaliation claims and four of the five she now raises were at least arguably present in her second-amended complaint. (*See* R. 24, ¶¶ 40–43, 81–84, 87–88, 112.) The exception is O'Dell's claim that Kelly opposed her application for unemployment benefits in retaliation for requesting accommodations. So that claim is beyond the scope of permitted amendment and will be dismissed.

As for O'Dell's defamation claims, the Court gave O'Dell rather broad leave to re-plead that claim. *See O'Dell*, 2017 WL 676945, at *13. And Kelly makes no argument that the third-amended complaint goes beyond what the Court allowed. So O'Dell's defamation claims are within the scope of permitted amendment.

One last scope-of-amendment issue. O'Dell alleges that she "was qualified for ten or more positions [that] Kelly Services held vacant between February 1 and May 20, 2013" (R. 60, PID 781) and Kelly says this allegation should be "stricken and dismissed" as beyond the scope of permitted amendment (R. 63, PID 806). As this is merely a factual allegation and not a legal claim, it does not need to be dismissed or stricken. If it is irrelevant, it can just be ignored.

* * *

In sum, the Court finds that the third-amended complaint sets forth the following claims within the scope of permitted amendment: (1) Kelly discriminated by (a) terminating O'Dell based on her communication impairment and (b) not reassigning O'Dell based on her impairments, both in violation of the ADA; (2)(a) Kelly did not provide a reassignment in retaliation for requesting accommodations, (b) Nicholson made a police report in retaliation for

requesting accommodations, (c) Nicholson made a police report in retaliation for O'Dell's threat to report Kelly's mischaracterization of her request for accommodations as quitting, (d) Kelly terminated O'Dell's employment in retaliation for O'Dell's threat to report Kelly's mischaracterization, each in violation of the ADA; (3)(a) Kelly denied reasonable accommodations to continue work as a call-center operator and (b) Kelly denied a reasonable accommodation of reassignment, each in violation of the ADA; and (4) Kelly made defamatory statements in (a) the police report, (b) the unemployment proceedings, and (c) the EEOC proceedings.

**B.**

Having identified the claims, the Court turns to the question of which are timely, starting with the ADA claims. The Court first determines when O'Dell filed her EEOC charge. The Court then identifies which of O'Dell's ADA claims are based on unlawful employment practices more than 300 days before the filing date. Last, the Court addresses O'Dell's many rebuttals to Kelly's timeliness argument.

**1.**

Kelly says that O'Dell's EEOC charge was filed too late to capture any unlawful employment practices before May 15, 2013. (*See* R. 63, PID 804–05.) Kelly says it follows that it cannot be liable for unlawful employment practices before May 15, 2013. The Court agrees.

O'Dell had 300 days "after [an] alleged unlawful employment practice occurred" to file a charge about the practice with the EEOC. *See* 42 U.S.C. § 2000e–5(e)(1); 42 U.S.C. § 12117(a). (The period would have been only 180 days, but because O'Dell first filed her charge about Kelly's employment practices with the Michigan Department of Civil Rights (R. 37, PID 358–59), she had 120 more days to file the charge with the EEOC, *see* 42 U.S.C. § 2000e–5(e)(1).) If

more than 300 days went by from when an unlawful employment practice occurred without O'Dell filing a charge about the practice, the practice is no longer "actionable." *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110, 114–15 (2002); *Parry v. Mohawk Motors of Michigan, Inc.*, 236 F.3d 299, 309 (6th Cir. 2000).

This law prompts this question: when did O'Dell file her charge with the EEOC? The answer is a bit more involved than it first appears. In its prior motion to dismiss, Kelly pointed to the EEOC's date stamp on O'Dell's charge; that stamp indicated a filing date of March 21, 2014. (*See* 37, PID 310.) The Court declined to accept this as the filing date, noting that O'Dell had initially filed her charge with the MDCR and when a claimant chooses to go to a state agency first (and indicates that the charge should also be filed with the EEOC), the charge is deemed filed with the EEOC on the "earliest" of three dates. *O'Dell*, 2017 WL 676945, at *4 (citing 29 C.F.R. § 1601.13(b)(1)). Those three dates: (1) 60 days (or sometimes 120) after the date the employee sends a "statement of facts" to the MDCR, (2) the date the MDCR proceedings end, or (3) the date the MDCR waives its right to "exclusively process the charge." 29 C.F.R. § 1601.13(b)(1). "Thus," this Court explained, "the effective filing date may be several days before the date . . . stamped on the charge. And a few days is significant because O'Dell says she was removed from [the call center] on May 20, 2013, and, under Kelly's calculations (based on the time stamp), events before May 25, 2013 are untimely." *O'Dell*, 2017 WL 676945, at *4.

As it turns out, the date stamp was not the filing date. O'Dell filed her charge with the MDCR on March 6, 2014. (R. 37, PID 359.) And a letter not previously presented to the Court reflects that, on March 11, 2014, the MDCR concluded that the charge was too late for its office and would be forwarded to the EEOC for processing. (R. 63, PID 815.) Thus, the MDCR

proceedings ended on March 11 so O'Dell's charge was deemed filed with the EEOC on March 11, 2014.

Coupling the prior two points—that O'Dell had 300 days from when an unlawful employment practice occurred to file her charge with the EEOC and that she filed her charge with the EEOC on March 11, 2014—leads to Kelly's (revised) conclusion: that any claim based on an unlawful employment practice that occurred before May 15, 2013, is not actionable.

**2.**

Which claims are those? Unfortunately, Kelly does not say. So the Court will endeavor to identify which of O'Dell's claims are not timely.

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), helps with this task. There, the Supreme Court held that "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act," and so a charge "must be filed within the 180– or 300–day time period after the discrete discriminatory act occurred." *Id.* at 113. A discrete act of discrimination based on a protected characteristic (or a discrete act of retaliation for protected conduct) includes "termination, . . . denial of transfer, or refusal to hire." *Id.* at 114. An employer's denial of an employee's request for an accommodation is also a discrete act. *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 130 (1st Cir. 2009) ("[T]he denial of a disabled employee's request for accommodation starts the clock running on the day it occurs. . . . [S]uch a denial is a discrete discriminatory act[.]").

Given the manner in which O'Dell pled her claims—providing date ranges instead of dates certain—applying *Morgan*'s rule requires care. If, for example, O'Dell requested a reasonable accommodation on April 1, 2013, and Kelly denied the request on May 14, 2013, any ADA failure-to-accommodate claim based on that denial would not be actionable (unless some

exception to the 300-day rule applies). But if Kelly waited a day longer to deny the same request, the failure to accommodate would be timely (assuming the charge raised it). The same would be true if Kelly denied the request before May 15, 2013, but O'Dell renewed it and Kelly's second denial was on or after that date. *Tobin*, 553 F.3d at 130 ("[A]n employee who renews his request for particular accommodations may bring suit based on a new 'discrete act' of discrimination if the employer again denies his request."). Similarly, if Kelly's retaliatory act took place prior to May 15, 2013, O'Dell cannot sue Kelly for it now; but if the retaliatory act occurred on or after May 15—even if the protected conduct was before that date—she could. *See Morgan*, 536 U.S. at 110 ("A discrete retaliatory . . . act 'occurred' on the day that it 'happened.'").

Reviewing O'Dell's ADA claims in light of these examples reveals that O'Dell's filing of the EEOC charge on March 11, 2014 requires dismissal of part of four claims.

Three of O'Dell's four retaliation claims are unaffected by the 300-day rule. In particular, O'Dell's three claims based on a retaliatory police report and retaliatory termination are not affected. But O'Dell's claim that Kelly retaliated by not providing a reassignment from the call-center position might be. "Might" because the third-amended complaint is not clear on when Kelly denied a reassignment or if Kelly did so on multiple occasions. It does clearly allege that Kelly denied reassignment sometime after the May 20 meeting with Nicholson. So that part of O'Dell's retaliation claim is unaffected by the 300-day rule. But O'Dell may have also alleged that Kelly denied requests for reassignment before May 15, 2013. (*See* R. 60, PID 776, 781.) To the extent O'Dell has done so, the Court finds that a retaliation claim based on those denials is not actionable.

One of O'Dell's failure-to-accommodate claims is also based on Kelly's failure to provide a reassignment. The viability of this claim tracks that of the retaliation claim based on

the failure to provide a reassignment: it is not actionable to the extent Kelly denied reassignments before May 15, but it is otherwise unaffected by the 300-day rule. O'Dell's other failure-to-accommodate claim, the one asserting that Kelly did not provide reasonable accommodations to continue as a call-center operator, is also partly not actionable. To the extent that Kelly denied those accommodations prior to May 15, the claim is not actionable. But O'Dell pleads that there was at least one denial after that date: "between February and *May 20*, 2013 [Kelly told Plaintiff] that no accommodations would be provided to allow her to continue working as a Call Center Operator." (R. 60, PID 776 (emphasis added).)

Turning to O'Dell's two discrimination claims, one is that Kelly terminated O'Dell based on her impaired communication. But Kelly fired O'Dell in August 2013 so that allegedly unlawful act occurred within the 300 days preceding her charge. O'Dell's other discrimination claim is that she did not receive a reassignment because she "self-identified as impaired." As with the retaliation and failure-to-accommodate claims based on not receiving a reassignment, if the denial of reassignment was before May 15, 2013, it is not actionable. But if after, it is unaffected by the 300 day filing rule.

In sum, Kelly's argument that all unlawful employment practices prior to May 15, 2013 are not actionable only bars part of four ADA claims: O'Dell's retaliation, failure-to-accommodate, and discrimination claims based on reassignment denials before May 15, 2013 and O'Dell's failure-to-accommodate claim based on denials of call-center accommodations before May 15, 2013.

**3.**

Perhaps thinking that Kelly's timeliness argument had more of an effect, O'Dell has raised a host of counterarguments.

For one, O'Dell says that she is entitled to equitable tolling. Although that doctrine can pause the 300-day clock, *see Morgan*, 536 U.S. at 113; *Amini v. Oberlin Coll.*, 259 F.3d 493, 500 (6th Cir. 2001), it does not help the four ADA claims now in jeopardy. O'Dell implies that she did not file her EEOC charge sooner because, on May 20, 2013, Nicholson told her she would receive a reassignment. (R. 65, PID 878.) But according to the third-amended complaint, the earliest Kelly could have denied O'Dell an accommodation of any sort, including reassignment, was in February 2013 (*see* R. 60, PID 776) and the latest O'Dell could have held out hope of an accommodation was her last day at Kelly, August 12, 2013. But as of that date, O'Dell still had more than 100 days left to file an EEOC charge about all the denials (assuming that, as ended up being the case, she filed the charge first with the MDCR). Yet O'Dell did not file her charge until March 2014—over 200 days after her termination. *See Amini*, 259 F.3d at 500 (finding plaintiff's lack of diligence to be a significant factor in deciding whether to equitably toll the 300-day clock for filing an EEOC charge). Moreover, O'Dell has not discussed any of the other factors that courts often consider in deciding whether to apply equitable tolling (e.g., lack of notice of the filing requirement or absence of prejudice to Kelly). *Id.* On this record then, the Court declines to equitably-toll the 300-day clock.

O'Dell also makes a very conclusory delayed-accrual argument: "Plaintiff did not know and had no means of discovering the cause of action based upon disability discrimination and retaliation until August 12, 2013." (R. 65, PID 879.) This unsubstantiated claim does not delay the accrual of claims based on Kelly's denials of call-center accommodations before May 15, 2013. O'Dell herself pleads that between "February and May 20, 2013," Kelly "expressly" told her that "no accommodations would be provided to allow her to continue working as a Call Center Operator." (R. 60, PID 776.) So O'Dell knew of those failures to accommodate right

when they happened. *See Amini*, 259 F.3d at 499 ("[The] starting date for the 300–day limitations period is when the plaintiff learns of the employment decision itself, not when the plaintiff learns that the employment decision may have been discriminatorily motivated."); *Almond v. Unified Sch. Dist. No. 501*, 665 F.3d 1174, 1177 (10th Cir. 2011) ("[A]n employee who discovers, or should have discovered, the *injury* (the adverse employment decision) need not be aware of the unlawful *discriminatory intent* behind that act for the limitations clock to start ticking."). As for Kelly's denials of a reassignment before May 15, 2013 (if there were any), O'Dell does not assert that the denials were not communicated to her before May 15, 2013. As such, she has not shown that the reassignment denials before May 15, 2013 did not accrue on the day of the denials.

O'Dell also argues that her ADA claims accrued in (or perhaps the 300-day clock was tolled until) April 2017. This is because, according to O'Dell, that is when she was "subjected to a background check for employment which turned up a false police complaint alleging workplace violence." (R. 64, PID 877.) This argument confuses the effect of an unlawful employment practice with the unlawful employment practice. The clock starts when the latter occurred, not the former. *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 627–28 (2007), *other grounds superseded by statute*, Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111–2, 123 Stat 5; *Ayala v. Shinseki*, 780 F.3d 52, 57–58 (1st Cir. 2015); *Bruce v. Corr. Med. Servs., Inc.*, 389 F. App'x 462, 466 (6th Cir. 2010).

O'Dell also says the continuing-tort doctrine applies. (R. 65, PID 875.) In support, she quotes a decision that says, "[w]hen a tort involves continuing injury, the cause of action accrues, and the limitation period begins to run, at the time the tortious conduct ceases." *Page v. United States*, 729 F.2d 818, 821 (D.C. Cir. 1984). According to O'Dell, Kelly's tortious conduct did

not cease until April 2017. (R. 65, PID 877.) But, as just discussed, the April 2017 background check was an effect of Kelly's alleged conduct, not Kelly's conduct. In any event, holding that all of O'Dell's ADA claims accrued when the last discriminatory or retaliatory act occurred would be very similar to holding that O'Dell's has properly relied on the continuing-violations theory. But as explained next, she has not.

O'Dell cites a 1984 decision that says, "[t]he continuing violations theory provides that where the last act alleged is part of an ongoing pattern of discrimination and occurs within the filing period, allegations concerning earlier acts are not time-barred." *Curry v. U.S. Postal Serv.*, 583 F. Supp. 334, 342 (S.D. Ohio 1984) (citing *Roberts v. North American Rockwell*, 650 F.2d 823, 827–28 (6th Cir. 1981)). But in a 2002 decision, the Supreme Court rejected this version of the continuing-violations theory as applied to discrete acts—even when the discrete acts are related. *See Morgan*, 536 U.S. at 113; *Sharpe v. Cureton*, 319 F.3d 259, 268 (6th Cir. 2003) ("*Morgan* overturns prior Sixth Circuit law addressing serial violations, i.e., plaintiffs are now precluded from establishing a continuing violation except by proof that the alleged acts of discrimination occurring prior to the limitations period are sufficiently related to those occurring within the limitations period."). Thus, the Court finds that neither the continuing-tort doctrine nor continuing-violations theory allows O'Dell to sue for discrete unlawful employment practices that occurred prior to May 15, 2013.

As none of O'Dell's arguments regarding the 300-day filing rule are persuasive, the Court maintains its conclusion that her retaliation, failure-to-accommodate, and discrimination claims based on reassignment denials before May 15, 2013 and her failure-to-accommodate claim based on denials of call-center accommodations before May 15, 2013 are not actionable.

**C.**

Remaining for analysis are Kelly's two arguments to dismiss O'Dell's defamation claims. Kelly says the claims are untimely. It also believes it was privileged to say what it said about O'Dell.

**1.**

The Court begins with Kelly's argument that O'Dell's defamation claims are barred by Michigan's statute of limitations.

Part of the analysis is straightforward. The Michigan legislature has "comprehensively establish[ed] limitations periods, times of accrual, and tolling for civil cases." *Trentadue v. Buckler Lawn Sprinkler*, 738 N.W.2d 664, 671 (Mich. 2007). And under that statutory scheme, a defamation claim must be filed within a year of when it accrues, *see* Mich. Comp. Laws § 600.5805(9), and it accrues when the defamatory statement was made, *see* Mich. Comp. Laws § 600.5827; *Mitan v. Campbell*, 706 N.W.2d 420, 422 (Mich. 2005) (applying § 600.5827 to a defamation claim); *McCormick v. Richard*, No. 315811, 2014 WL 4628847, at *2 (Mich. Ct. App. Sept. 16, 2014) (same). Coupling that rule of law with the fact that O'Dell filed her complaint on October 7, 2015 means that (absent some exception like tolling) any defamatory statements Kelly made before October 7, 2014 are untimely.

The harder part is determining when Kelly allegedly made each of the defamatory statements: before or after October 7, 2014? O'Dell's third-amended complaint does not say when each of the alleged defamatory remarks were made. She merely alleges that Kelly represented her as violent, threatening, and a trespasser to the Flint Township Police Department, during the EEOC proceedings, and during the unemployment proceedings. (*See* R. 60, PID 781–82.) Nicholson made the report to the police in August 2013 (R. 60, PID 777), so it is clear that

those alleged defamatory statements were well before October 7, 2014. The difficulty is the EEOC and unemployment proceedings: both started well before October 7, 2014 and both ended well after. In particular, the EEOC investigation spanned from March 2014 to July 2015 (*see* R. 48, PID 590–92) and the unemployment proceedings (when including Kelly's state-court appeals) spanned from mid-2013 to January 2015 (*see* R. 48, PID 500, 593). So if Kelly made the alleged defamatory statements more toward the start of these proceedings, O'Dell filed suit over them too late; but if Kelly made them more toward the end of these proceedings (i.e., on or after October 7, 2014), O'Dell filed suit in time. Unfortunately, O'Dell's third-amended complaint is too vague for the Court to determine at which point during these two proceedings Kelly allegedly made defamatory statements.

In its motion, Kelly says that the alleged defamatory statements in the EEOC proceedings were contained in its May 1, 2014 position statement and that it provided O'Dell's Facebook post (the one about workplace violence) to the unemployment agency on February 18, 2014. (R. 60, PID 806.) Kelly further asserts, "Because none of the alleged defamatory matters occurred after October 7, 2014, Plaintiff's defamation claims are untimely and dismissal is proper." (R. 63, PID 806.)

But this Court declines to rely completely on a defendant's self-serving clarification of a vague complaint when, as here, the plaintiff contests the clarification. Although conclusory, O'Dell says, "defendants made statements of fact (not opinion) which they knew to be false, which were of and concerning plaintiff and highly offensive to a reasonable person between (at latest) May 2013 [and the] *date of filing of the federal complaint.*" (R. 65, PID 880 (emphasis added).) O'Dell filed her complaint in 2015, so she maintains that Kelly made defamatory remarks on or after October 7, 2014.

So for now, on a Rule 12(b)(6) motion, all this Court can say for certain is that to the extent O'Dell alleges defamation based on remarks made before October 7, 2014, those claims are untimely.

O'Dell makes a number of arguments against this conclusion. None persuade.

She says that she could not have discovered Kelly's defamatory statements made during the EEOC proceedings until December 2016 because the EEOC does not provide a claimant with the whole of her employer's submissions during the course of the proceedings. (*See* R. 65, PID 879.) Essentially then, O'Dell asks the Court to apply the common-law discovery rule where a claim does not accrue (or the statute of limitations is tolled) until the claim could have been discovered. *See Trentadue v. Buckler Lawn Sprinkler*, 738 N.W.2d 664, 666–67 (Mich. 2007). But in *Trentadue*, the Michigan Supreme Court held that when, as here, Michigan Compiled Laws § 600.5827 specifies when a claim accrues, "courts may not employ an extrastatutory discovery rule to toll accrual." *Id.* at 672; *see also Gary v. Comcast Entm't Grp.*, No. 304720, 2012 WL 3640294, at *1 (Mich. Ct. App. Aug. 23, 2012) ("[A]bsent a statutory exception, a defamation claim accrues on the day on which the alleged defamation first occurred, regardless of when plaintiff discovered the defamation[.]").

O'Dell also asks the Court to equitably toll the statute of limitations. The factual basis for any such relief is unclear—perhaps it is that she could not have discovered the defamatory statements to the EEOC earlier than December 2016. In any event, the Michigan Supreme Court has indicated that equitable tolling only applies when the law is unclear about the limitations period. *Trentadue*, 738 N.W.2d at 679–80; *see also Foltz v. Fox*, No. 332256, 2017 WL 3044104, at *4 (Mich. Ct. App. July 18, 2017) ("*Trentadue* instructs that equitable tolling is only available in circumstances where the courts themselves have created confusion regarding the

time in which a party has to file a claim"). Indeed, in *Chabad-Lubavitch of Michigan v. Schuchman*, 853 N.W.2d 390 (Mich. Ct. App. 2014), the Michigan Court of Appeals applied equitable tolling where the parties engaged in pre-suit dispute resolution required by their religion. But the Michigan Supreme Court reversed: "there are no grounds on which to equitably toll the statute of limitations." *Chabad-Lubavitch of Michigan v. Schuchman*, 862 N.W.2d 648 (table) (Mich. 2015). The Court explained that Michigan's statutory scheme setting forth the limitation periods for civil claims was "exclusive." *Id.*

Although unclear, O'Dell may also be asserting that her claims based on defamatory statements before October 7, 2014 were timely filed under the continuing-tort doctrine, i.e., that the one-year clock only began to run upon Kelly's last defamatory statement. (*See* R. 65, PID 876.) But O'Dell cites neither case nor statute suggesting that Michigan recognizes any such doctrine. And even if the continuing-violations theory still has some life outside the civil-rights arena, Michigan courts have refused to apply it to save untimely defamation claims. *See McCormick v. Richard*, No. 315811, 2014 WL 4628847, at *2 (Mich. Ct. App. Sept. 16, 2014); *Gorman Golf Prod., Inc. v. FPC, L.L.C.*, No. 295201, 2011 WL 4424349, at *4 (Mich. Ct. App. Sept. 22, 2011); *Nelski v. Ameritech*, No. 273728, 2007 WL 1376349, at *4 (Mich. Ct. App. May 10, 2007). O'Dell has not persuaded this Court to do otherwise.

O'Dell also says that Michigan Compiled Laws § 600.6304's "continuing liability" language saves her untimely defamation claims. (R. 60, PID 876.) But O'Dell misreads this statute. It says that when liability is reallocated from one person to another, the first person "continues to be subject to contribution and to any continuing liability to the plaintiff on the judgment." Section 600.6304 has nothing to do with the timeliness of a defamation claim.

Thus, any defamation claims based on statements Kelly made before October 7, 2014 will be dismissed.

## 2.

So that leaves any defamatory statements made on or after that date. Although Kelly took the position that there were none, it made an alternative argument: that any defamatory statements it made in the course of the EEOC or the unemployment proceedings were absolutely privileged. For now, the Court agrees only in part with Kelly.

Defamatory statements are absolutely privileged if (1) made "during the course of judicial proceedings" and (2) "relevant, material, or pertinent to the issue being tried." *Oesterle v. Wallace*, 725 N.W.2d 470, 474 (Mich. Ct. App. 2006). And if the statement is absolutely privileged, a plaintiff cannot recover for defamation. *Id.* This is so even if the defamatory statement "was false and maliciously published." *Id.*

Taking the unemployment proceedings first, a review of public documents proper for judicial notice reveals that the administrative portion of the proceedings wrapped up by May 14, 2014. *See Dumas v. Kelly Servs. Inc.*, No. 2014-140801-AA (Mich. Cir. Ct. filed May 14, 2014). Thus, any defamatory remarks in the unemployment proceedings that are not barred by the statute of limitations (i.e., those after October 7, 2014) must have been made during Kelly's appeal to state court. And court proceedings are, quite obviously, "judicial proceedings." So the first requirement of the absolute-privilege test is met. *See Oesterle*, 725 N.W.2d at 474 (providing that the privilege extends to "every step" in a judicial proceeding, including statements in affidavits and pleadings).

As to the relevancy requirement, "What a litigant considers to be pertinent or relevant is given much freedom, and the privilege is liberally construed as a matter of public policy so that

participants in judicial proceedings may have relative freedom to express themselves without fear of retaliation." *Lawrence v. Burdi*, 886 N.W.2d 748, 757 (Mich. Ct. App. 2016) (internal quotation marks omitted). So the alleged defamatory statement "need not be strictly relevant to any issue involved in the litigation" for it to be absolutely privileged. *Id.* (internal quotation marks omitted). Moreover, "[a] presumption of relevancy of the statements arises once it is established that the statements were made during the course of a judicial proceeding." *Meyer v. Hubbell*, 324 N.W.2d 139, 143 (Mich. Ct. App. 1982); *see also Hartung v. Shaw*, 89 N.W. 701, 701 (Mich. 1902).

Here, O'Dell has not rebutted the presumption of relevancy. Her third-amended complaint asserts that Kelly defamed her by sharing her private Facebook post, representing her as violent, saying she threatened her employer, and accusing her of trespassing on her employer's property. (R. 60, PID 782.) But O'Dell made no effort to plead that these representations were not relevant to the unemployment proceedings. Moreover, in its motion, Kelly asserts that it made these (or like) representations to explain why O'Dell was not entitled to unemployment benefits (*see* R. 63, PID 807) and O'Dell has not rebutted this assertion (*see* R. 65, PID 879–80). As O'Dell has pled that defamatory statements were made in a judicial proceeding but has not pled that they were irrelevant (or even offered developed argument on that point), the Court finds that the absolute privilege applies on the face of the complaint. *See Meyer*, 324 N.W.2d at 143 ("Although plaintiff alleged that the defendants perjured themselves by testifying falsely at trial, he did not allege any facts whatsoever to the effect that the testimony was not relevant, material or pertinent. Thus, the absolute privilege was conclusively established by the failure of plaintiff to plead facts which would rebut the presumption."); *Pagoto v. Hancock*, 200 N.W.2d 777, 779 (1972) (similar).

That leaves the EEOC proceeding. Kelly urges the Court to find the EEOC's conciliation process to be a "judicial proceeding" such that the absolute privilege would apply to any defamatory statements made there. It even cites several cases to that effect, including one decided by a judge of this District. (*See* R. 63, PID 807–08.)

The Court declines to make this broad legal determination. Although the EEOC did not issue a right-to-sue letter until July 2015, Kelly's position statement was much earlier, in May 2014. So there is a good possibility that all of Kelly's statements to the EEOC were before October 7, 2014. The Court will thus place the burden on O'Dell to plead the specific defamatory statements that Kelly allegedly made in the course of the EEOC proceedings after October 7, 2014—if any. *See Ghanam v. Does*, 845 N.W.2d 128, 140 (Mich. Ct. App. 2014) ("[A] defamation claim must be pleaded with specificity by identifying the exact language that the plaintiff alleges to be defamatory." (internal quotation marks omitted)). If O'Dell does so, Kelly can ask the Court to reengage its absolute-privilege argument.

### III.

In sum, the Court DISMISSES O'Dell's ADA claims insofar as they are based on an unlawful employment practice that "occurred" before May 15, 2013. Thus, the following are the remaining ADA claims in this case: (1)(a) Kelly discriminated by terminating O'Dell based on her communication impairment; (1)(b) *on or after May 15, 2013*, Kelly discriminated by not reassigning O'Dell based on her impairments; (2)(a) *on or after May 15, 2013*, Kelly did not provide a reassignment in retaliation for requesting accommodations; (2)(b) Nicholson (or another defendant) made a police report in retaliation for requesting accommodations; (2)(c) Nicholson (or another defendant) made a police report in retaliation for O'Dell's threat to report Kelly's mischaracterization of her request for accommodations as quitting; (2)(d) Kelly

terminated O'Dell's employment in retaliation for O'Dell's threat to report Kelly's mischaracterization; (3)(a) *on or after May 15, 2013*, Kelly denied reasonable accommodations to continue work as a call-center operator; (3)(b) *on or after May 15, 2013*, Kelly denied a reasonable accommodation of reassignment.

In addition, the Court DISMISSES WITH PREJUDICE O'Dell's defamation claim insofar as it is based on statements made by Kelly before October 7, 2014 or statements made by Kelly in state court. This means that O'Dell's claims that Kelly defamed her in making the police report and in the course of the unemployment proceedings are DISMISSED WITH PREJUDICE. But the Court DISMISSES WITHOUT PREJUDICE the remainder of O'Dell's defamation claim. If O'Dell can in good faith plead that Kelly made defamatory statements during the course of the EEOC proceedings, and that those statements were on or after October 7, 2014, she may amend her complaint to specifically plead those statements. Any amended complaint must be filed by February 21, 2018. The failure to file an amended complaint will result in dismissal with prejudice of the whole of O'Dell's defamation count without further order from this Court.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
Dated: January 31, 2018    U.S. DISTRICT JUDGE

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 31, 2018.

s/Keisha Jackson
Case Manager